# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5375 | **DATE** | 8/20/2003 |
| **CASE TITLE** | Rush-Presbyterian-St. Luke's Med. Ctr. vs. Thompson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Cross-motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion for summary judgment [16-1] is denied and Defendant's motion for summary judgment [18-1] is granted.

*/s/ Charles R. Norgle/*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | AUG 2 5 2003 | |
| | Notified counsel by telephone. | date docketed | |
| X | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | courtroom deputy's initials | 03 AUG 22 PM 4:24 Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

Rush-Presbyterian-St. Luke's ) 
Medical Center, ) No. 02 C 5375
 ) (consolidated 02 C 8347, 02 C 8348, 02 C
 ) 8349, 02 C 8350)
 )
Plaintiff, )
 )
v. ) Judge Charles R. Norgle
 )
Tommy G. Thompson, )
Secretary of the United States Department )
of Health and Human Services )
 )
Defendant. )



## OPINION AND ORDER

CHARLES RONALD NORGLE, Judge.

Before the court are cross-motions for summary judgment brought by Plaintiff, Rush-Presbyterian-St. Luke's Medical Center ("Rush"), and Defendant, Tommy G. Thompson, Secretary of the United States Department of Health and Human Services (the "Secretary"), seeking determination of whether certain Medicare program payments were properly made pursuant to 42 U.S.C. § 1395ww(d)(5)(A)(iv).

## I. BACKGROUND[1]

Medicare is a federal health insurance program, which was enacted in 1965 in Title XVIII of the Social Security Act, which provides hospitalization and other benefits for the aged and disabled. See 42 U.S.C. § 1395 et seq. In essence, the Medicare program provides these services through a "complex statutory and regulatory regime," Good Samaritan Hosp. v. Shalala, 508 U.S.

---

[1] The court takes the facts from the parties' Local Rule 56.1 statements and accompanying briefs.

402, 404 (1993), which reimburses qualifying hospitals for services provided to eligible patients. See 42 U.S.C. § 1395 *et seq*. Hospitals may choose to participate in the Medicare program by filing an agreement with the Secretary. See 42 U.S.C. § 1395cc.

Plaintiff Rush-Presbyterian-St. Luke's Medical Center ("Rush") is a large hospital located in Chicago, Illinois. At all pertinent times, Rush was duly qualified as a provider of inpatient services under the Medicare program in accordance with 42 U.S.C. § 1395cc.

From the inception of the Medicare program in 1965, until 1983, hospitals were reimbursed for the "reasonable costs" of inpatient services that were rendered. See County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999). "This system, it was argued, 'was like giving hospitals a blank check to cover the cost of care...,' because increased costs were simply forwarded to Medicare." Little Company of Mary Hosp. and Health Care Ctrs. v. Shalala, 24 F.3d 984, 987 (7th Cir. 1994) (citing Judith R. Lave, The Impact of the Medicare Prospective Payment System and Recommendations for Change, 7 Yale J. Reg. 499, 501 (1990)). To curb these perceived inefficiencies, Congress replaced the "reasonable costs" system with the "Prospective Payment System" ("PPS") by passing the Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65. See id. Subsequent to 1983, qualifying hospitals have been reimbursed under PPS at prospectively fixed rates, regardless of actual costs incurred by the hospitals in rendering services. See generally 42 U.S.C. § 1395ww (discussing payments to hospitals for inpatient hospital services under PPS).

The determination of these prospectively fixed rates under the Medicare program involves a complex calculus. Prior to the beginning of every federal fiscal year, the Secretary conducts a rulemaking proceeding to determine the prospective rates for the coming fiscal year, and the

Secretary must then publish these prospective rates. See 42 U.S.C. § 1395ww(d)(6). To generalize, these prospective rates are derived from a statutory formula, which is based on a standard nationwide cost rate based on, *inter alia*, the average operating costs of inpatient hospital services, see 42 U.S.C. § 1395ww(d)(2), and how an individual patient is classified by diagnosis related group ("DRG"), see 42 U.S.C. § 1395ww(d)(3). This reimbursement amount is referred to as the DRG prospective payment rate. In short, the DRG prospective payment rate reflects the average costs associated with treating a patient for a specific condition, and encourages hospitals to keep costs within these prospectively set reimbursement rates.

In reaction to this prospective payment system, hospitals argued that they would not be compensated for services rendered to patients in cases where the treatment exceeded the prospectively set costs of hospitalization. See Hearings Before the Comm. on Ways and Means, H. Hrg. No. 98-3, at 218 (1983). In order to mitigate the financial burdens on hospitals in situations where actual costs would far exceed PPS rates for a given patient based on that patient's DRG, Congress provided for the Secretary to make supplemental "outlier" payments. See 42 U.S.C. § 1395ww(d)(5)(A). Like the PPS rate, prior to the beginning of every federal fiscal year, the Secretary sets the thresholds for determining what constitutes an "outlier." Once the applicable outlier thresholds are reached, a hospital receives payment for a percentage of its costs that exceed the outlier thresholds.

In this case, Rush is challenging the Secretary's determination of outlier payments for the years of 1991, 1992, 1993, 1994, and 1996.[2] In the years at issue in this case, the outlier payment clauses were set forth in 42 U.S.C. § 1395ww(d)(5)(A)(i - iv). In the first two clauses, 42 U.S.C. §

---

[2] Rush failed to perfect its appeal for the federal fiscal year of 1995.

1395ww(d)(5)(A)(i - ii), Congress established two classes of outliers, "day outliers" and "cost outliers." The clause concerning "day outliers" provided:

> The Secretary shall provide for an additional payment for a subsection (d) hospital for any discharge in a diagnosis-related group, the length of stay of which exceeds the mean length of stay for discharges within that group by a fixed number of days or exceeds such mean length of stay by some number of standard deviations, whichever is the fewer number of days.

42 U.S.C. § 1395ww(d)(5)(A)(i). The provision concerning "cost outliers" provided: "For cases which are not included in clause (i), a subsection (d) hospital may request additional payments in any case where charges, adjusted to cost, exceed either a fixed multiple of the applicable DRG prospective payment rate, or exceed such other fixed dollar amount, whichever is greater." 42 U.S.C. § 1395ww(d)(5)(A)(ii). The third clause, concerning outlier payments generally, provided: "The amount of such additional payment under clauses (i) and (ii) shall be determined by the Secretary and shall approximate the marginal cost of care beyond the cutoff point applicable under clause (i) or (ii)." 42 U.S.C. § 1395ww(d)(5)(A)(iii). The fourth clause, concerning outlier payments generally, and the clause at issue in this case, provided:

> The total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.

42 U.S.C. § 1395ww(d)(5)(A)(iv). The Secretary has interpreted this clause as mandating that he prospectively establish the fixed thresholds beyond which hospitals will qualify for outlier payments at levels likely to result in outlier payments between 5 - 6 percent of the projected DRG prospective payments for that year, and that any shortages need not be reimbursed. See e.g., 49 Fed. Reg. 234, 265-66 (January 3, 1984) (stating Secretary's position that "there is no necessary connection between

the amount of estimated outlier payments and the actual payments made to hospitals for cases that actually meet the outlier criteria").

For the years at issue in this case, the Secretary set the outlier thresholds at levels estimated to approximate 5.1 percent of DRG payments. For those years, the actual outlier payments made, represented as percentages of projected DRG prospective payments, were as follows: 1991 - 4.2; 1992 - 3.6; 1993 - 4.2; 1994 - 3.5; and 1996 - 4.2. Thus in each year at issue in this case, actual outlier payments fell short of the outlier thresholds set by the Secretary. Rush timely appealed the Secretary's final determination of payments for each of the years at issue, seeking retroactive reimbursements to make up the difference, and the Provider Reimbursement Review Board certified the cases for "expedited judicial review." See 42 U.S.C. § 1395oo(f)(1). Rush filed separate actions for each of the years at issue[3], and later filed a motion to consolidate and reassign the cases, which was granted. The matter is properly before this court, fully briefed and ready for ruling.

The parties' dispute is focused on one sentence within the complex statutory framework that establishes the Medicare program. It is the contention of Rush that, based on the plain meaning of 42 U.S.C. § 1395ww(d)(5)(A)(iv), the *actual* outlier payments for a given year must fall within the 5 - 6 percent range of the DRG prospective payments for that year, and that any shortages must be retroactively reimbursed. In response, it is the contention of the Secretary that, pursuant to 42 U.S.C. § 1395ww(d)(5)(A)(iv), the Secretary must prospectively establish the fixed thresholds beyond which hospitals will qualify for outlier payments at levels *likely to result* in outlier payments between 5 - 6 percent of the projected DRG prospective payments for that year, and that any shortages need

---

[3] The cases filed by Rush are as follows: 02 C 5375 (challenging outlier payments for FFY 1991), 02 C 8347 (challenging outlier payments for FFY 1992), 02 C 8348 (challenging outlier payments for FFY 1996), 02 C 8349 (challenging outlier payments for FFY 1993), 02 C 8350 ( challenging outlier payments for FFY 1994).

5

not be reimbursed. Thus, the parties disagree as to whether, as a matter of law pursuant to 42 U.S.C. § 1395(d)(5)(A)(iv), the Secretary is required to retroactively change the outlier payment amount if the actual payments do not match the outlier thresholds set by the Secretary.

## II. DISCUSSION

### a. Standard of Review

A grant of summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The fact that the parties have filed cross-motions for summary judgment does not affect the applicable standard. See I.A.E., Inc. v. Shaver, 74 F.3d 768, 774 (7th Cir. 1996). "'We therefore apply the traditional standard that summary judgment will not lie unless, construing all inferences in favor of the party against whom the motion is made, no genuine issue of material fact exists.'" Id. (citing Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983)). In the present case, the material facts relevant to the parties' motions are not in dispute. The case turns on the interpretation of a statute, and is therefore properly resolved on a motion for summary judgment. See LTV Steel Co., Inc. v. Northwest Eng'g & Constr., Inc., 41 F.3d 332, 334 (7th Cir. 1994).

### b. Proper Analytic Framework for Statutory Interpretation of 42 U.S.C. §1395(d)(5)(A)(iv)

This court's review of the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(A)(iv) is governed by the analysis set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the analysis in Chevron, this court must decide: (1) whether the statute unambiguously forbids the Secretary's interpretation, and, if not, (2) whether the Secretary's

6

interpretation is based on a permissible construction of the statute. See Chevron, 467 U.S. at 842-43; see also Barnhart v. Walton, – U.S. –, 122 S.Ct. 1265, 1269 (2002); Wood v. Thompson, 246 F.3d 1026, 1029 (7th Cir. 2001).

c. **Analysis**

The arguments of both parties in the present case are nearly identical to the arguments advanced in a similar case. See County of Los Angeles v. Shalala, 1998 WL 24123 (D.D.C. 1998), rev'd by 192 F.3d 1005 (D.C. Cir. 1999), certiorari denied by 530 U.S. 1204 (May 30, 2000). In County of Los Angeles, numerous hospitals brought suit against the Secretary challenging the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(a)(iv), and his alleged failure to provide retroactive payments to make actual outlier payments fall within the 5 - 6 percent range of the DRG prospective payments each year. See id. at * 1. The District Court for the District of Columbia interpreted 42 U.S.C. § 1395ww(d)(5)(a)(iv) as plainly commanding the Secretary to ensure that actual outlier payments fall within the 5 - 6 percent range of the DRG prospective payments each year. See id. at * 4 (finding "no ambiguous wording in subsection (iv) that is susceptible to more than one meaning"). However, on appeal, the Court of Appeals for the District of Columbia reversed, finding that the wording in subsection (iv) was ambiguous, and therefore, the Secretary's interpretation was entitled to deference. See 192 F.3d at 1015 - 19.

The parties' arguments in support of their respective motions for summary judgment track the arguments advanced in County of Los Angeles. The parties' advance three main arguments, which require this court to attempt to determine: (1) the plain meaning of the statutory text, (2) the meaning of the statutory text within its context, and (3) the meaning of the statutory text based on legislative history. The court will address each argument in turn.

7

## 1. The Plain Meaning of the Statutory Text

First, Rush argues that by indicating in paragraph (5)(A)(iv) that "[t]he total amount of the additional payments *made* . . . may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year," 42 U.S.C. § 1395ww(d)(5)(A)(iv) (emphasis added), Congress intended the actual outlier payments for a given year must fall within the 5 - 6 percent range of the projected DRG prospective payments for that year, and that any shortages must be retroactively reimbursed. Specifically, Rush argues that based on the plain meaning of the statute, the phrase "payments made" clearly denotes a past tense, or retrospective look, since a past tense verb was utilized.

In response, it is the contention of the Secretary that, pursuant to 42 U.S.C. § 1395ww(d)(5)(A)(iv), the Secretary must prospectively establish the fixed thresholds beyond which hospitals will qualify for outlier payments at levels likely to result in outlier payments between 5 - 6 percent of the projected DRG prospective payments for that year, and that any shortages need not be reimbursed. Specifically, the Secretary responds that the phrase "payments made" does not clearly denote a past tense. The Secretary argues that the word "made" is not used as a past tense verb, but rather as a part of an adjectival phrase, the tense of which is subject to alternative temporal meanings, and thus ambiguous.

This situation is similar to that confronted by the United States Supreme Court in Regions Hosp. v. Shalala, 522 U.S. 448, 458 (1998), where the Court was called on to interpret whether the words "recognized as reasonable" in 42 U.S.C. § 1395ww(h)(2)(A) had any temporal significance. In Regions, the petitioner challenged the validity of a reaudit rule for Medicare program reimbursements for graduate medical education costs ("GME"), arguing that the words "recognized

as reasonable" referred to the time when the hospital originally sought reimbursement. See id. at 457-58. The Secretary, in contrast, interpreted the words "recognized as reasonable" to refer to the time when the Secretary was conducting the reaudit. See id. The Court stated that "the phrase 'recognized as reasonable' might mean costs the Secretary (1) *has* recognized as reasonable for 1984 GME cost-reimbursement purposes, or (2) *will* recognize as reasonable as a base for future GME calculations." See id. at 458 (emphasis in original). The Court found the words "recognized as reasonable" to be ambiguous since the statute was silent as to the matter of time, and thus, the words had no clear temporal significance. See id. Therefore, the Court deferred to the Secretary's interpretation of the statute. See id.

This situation is the same as that considered by the Court of Appeals for the District of Columbia in County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999), where that court interpreted the exact phrase at issue in the present case. In that case, that court found that "[s]tanding alone, the phrase 'payments made' hardly conveys a single meaning." Id. at 1013. Further, that court indicated that "[a]s it is employed in paragraph (5)(A)(iv), 'payments made' is 'simply an adjectival phrase, not a verbial phrase indicating the past tense, and hence allows alternate temporal readings.'" Id. (citing United States Dep't of the Treasury v. FLRA, 960 F.2d 1068, 1072 (D.C. Cir. 1992)).

This court agrees with the reasoning of the Court of Appeals for the District of Columbia, and finds the phrase "payments made" ambiguous, since it is silent on the matter of time. Cf. Regions Hosp. v. Shalala, 522 U.S. 448, 458 (1998). Viewing the phrase "payments made" in isolation, the phrase imports no clear meaning, and could be construed in each of the manners suggested by the parties. As aptly stated by the Court of Appeals for the District of Columbia:

9

> In other words, instead of embodying a retrospective inquiry into the amount of outlier payments that *have been* made, the phrase 'payments made under this subparagraph' might just as plausibly reflect a prospective command to the Secretary about how to structure outlier thresholds for payments *to be* made in advance of each fiscal year.

County of Los Angeles, 192 F.3d at 1013 (emphasis in original).

### 2. The Meaning of the Statutory Text Within Its Context

Next, Rush contends that by viewing paragraph (5)(A)(iv) in context the phrase "payments made" clearly shows Congress' mandate that actual outlier payments be between 5 - 6 percent of projected DRG prospective payments. Rush's argument is that paragraph (5)(A)(iv) establishes a calculation for outlier payments, with the numerator of this calculation being the phrase "[t]he total amount of payments made under this subparagraph for discharges in a fiscal year" and the denominator of this calculation being the phrase "the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year." 42 U.S.C. § 1395ww(d)(5)(A)(iv). Thus, based on a principle of statutory construction, since the statute used different language for the numerator and the denominator of this calculation, a different meaning must have been intended for that different language. According to Rush, since Congress used words of estimation in the denominator, referring to projected DRG prospective payments, and did not use similar words of estimation in the numerator, referring to outlier payments, Congress must have intended that actual outlier payments made would be between 5 - 6 percent of projected DRG prospective payments.

In response to Rush's statutory context argument, the Secretary argues that the context only creates further ambiguity when the phrase is interpreted in light of 42 U.S.C. § 1395ww(d)(3)(B). The text of 42 U.S.C. § 1395ww(d)(3)(B) provides:

> The Secretary shall reduce each of the average standardized amounts determined under subparagraph (A) by a factor equal to the proportion of payments under this subsection (as estimated by the Secretary) based on DRG prospective payment amounts which are additional payments described in paragraph (5)(A) (relating to outlier payments).

Specifically, the Secretary indicates that 42 U.S.C. § 1395ww(d)(3)(B), which directs the Secretary to reduce the DRG prospective payment rate by the estimated proportion of outlier payments, refers to outlier payments to be made under paragraph (5)(A) as being estimated by the Secretary - with no mention of actual outlier payments being required to reach a certain percentage of projected DRG prospective payments.

While Rush's argument is in line with principles of statutory construction, another pertinent section of the statute refers to outlier payments as being estimations. This language indicates that outlier payments are to be estimated by the Secretary, and is consistent with the Secretary's interpretation that he must prospectively establish the fixed outlier thresholds beyond which hospitals will qualify for outlier payments at levels likely to result in outlier payments between 5 - 6 percent of the projected DRG prospective payments for that year. Therefore, viewed in its statutory context, the meaning of the phrase "payments made" becomes no clearer. In short, with no clear pronouncement of Congressional intent within 42 U.S.C. § 1395ww(d)(5)(A)(iv) or elsewhere within the relevant statutory context, the meaning of the phrase "payments made" is ambiguous.

### 3. The Meaning of the Statutory Text Based on Legislative History

Lastly, Rush also argues that the pertinent legislative history supports its position. Specifically, Rush argues that the Conference Report accompanying the final form of the legislation clearly demonstrated Congress' intent that the Secretary ensure that actual outlier payments in a

given federal fiscal year fall within a specified range. See H.R. Conf. Rep. No. 98-47, at 188-89 (1983). However, this argument is rejected because the legislative history is generally ambiguous, and where it appears to be unambiguous, the interpretation advanced by the Secretary is more convincing.

In general, "the committee reports explaining [legislation] may have considerable significance in guiding interpretation." American Hosp. Ass'n. v. NLRB, 899 F.2d 651, 657 (7th Cir. 1990). However, the committee reports concerning outlier payments, provide no explanation. The committee report simply states: "The Conference agreement follows the Senate amendment." H.R. Conf. Rep. No. 98-47, at 189. As concerns the Senate amendment, the committee report simply states: "Under the Senate amendment, the Secretary would be required to provide additional payments for outlier cases mounting to not less than 5 percent, and not more than 6 percent, of total projected or estimated DRG related payments." Id. The committee report sheds no light on the specific text at issue in the present case, and what it does illuminates tends to support the Secretary's interpretation by use of the terms "projected or estimated." Id.

In summation, the court finds the statutory text ambiguous, and under Chevron, proceeds to determine whether the Secretary's interpretation is based on a permissible construction of the statute. 467 U.S. at 842-43; see also Barnhart, – U.S. –, 122 S.Ct. at 1269; Wood, 246 F.3d at 1029.

In determining whether the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(A)(iv) is permissible, the court is guided by the Seventh Circuit's instruction that "[t]he more technical the issue is, the less guidance the statute provides to its correct resolution, the more sensible-seeming the agency's decision, and the more deliberative and empirical the procedures employed in arriving at that decision, the greater the deference that a reviewing court will give it." Krzalic v. Republic

Title Co., 314 F.3d 875, 878-79 (7th Cir. 2002).

The Secretary's interpretation reflects the longstanding interpretation of the outlier payment program by the HHS. In response to comments on whether 42 U.S.C. § 1395ww(d)(5)(A)(iv) required that actual outlier payments fall between 5 - 6 percent of projected DRG prospective payments, the Secretary of HHS responded:

> *[T]here is no necessary connection between the amount of estimated outlier payments and the actual payments made to hospitals for cases that actually meet the outlier criteria.* While we expect that under these criteria outlier payments will approximate six percent of total payments, we will pay for any outlier that meets the criteria, even if aggregate outlier payments result in more than six percent of total payments. Under such circumstances, we will continue to make these payments for the remainder of the Federal fiscal year without adjusting the DRG rates to compensate for the additional payments. Similarly, *if we overestimate the amount of outlier payments, we will not adjust the DRG rates to compensate hospitals for funds that were not actually paid for outlier cases.*

49 Fed. Reg. 234, 265-66 (January 3, 1984) (emphasis added). This interpretation has been consistent over the past nineteen years, the entire duration of PPS. See e.g., 57 Fed. Reg. 39746, 39783 (September 1, 1992) (stating, "we do not believe that it is appropriate to make an adjustment in prospective payment system payments to account for the difference between the estimated and actual FY 1991 outlier payments, just as we have not made adjustments in earlier years" (citations omitted)). A court "will normally accord particular deference to an agency interpretation of 'longstanding' duration." See Barnhart, 122 S.Ct. at 1270 (citing North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 522 n. 12 (1982)).

Further, the Secretary's interpretation is reasonable in light of the basic objectives of the Medicare program. In 1983, Congress replaced the "reasonable costs" system of reimbursement with PPS, a system which reimbursed Medicare providers at prospectively fixed rates without regard to

13

actual costs incurred. In recognizing that an argument for retroactive reimbursement has no place under PPS, the Court of Appeals for the District of Columbia stated:

> One of the touchstones of the Prospective Payment System, as its name suggests, is prospectively determined reimbursement rates that remain constant during the fiscal year. In setting, prior to each fiscal year, fixed outlier thresholds and per-diem reimbursement rates that are not later subject to retroactive correction, the Secretary promotes certainty and predictability of payment for not only hospitals but the federal government -- concerns that played a prominent role in Congress's decision to adopt PPS.

County of Los Angeles, 192 F.3d at 1019 (citing H.R. Rep. No. 98-25, at 132). The impetus for PPS was to curb perceived inefficiencies within the "reasonable costs" system, and to encourage hospitals to keep costs down. The Secretary's interpretation is consistent with those purposes, while Rush's interpretation is contrary to those purposes.

Finally, Congress has amended the statutory provisions at issue in this case without any change to the Secretary's longstanding interpretation. Such action by Congress serves as evidence that the Secretary's interpretation was intended or viewed as statutorily permissible. See Barnhart, 122 S.Ct. at 1271 (citing Commodity Futures Trading Comm. v. Schor, 478 U.S. 833, 845-46 (1986).

Therefore, the court finds the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(A)(iv) is based on a permissible construction of the statute.

In conclusion, this court finds that 42 U.S.C. § 1395ww(d)(5)(A)(iv) is ambiguous and that the Secretary's interpretation is based on a permissible construction of the statute. See Chevron, 467 U.S. at 842-43; see also Barnhart, 122 S.Ct. at 1269; Wood, 246 F.3d at 1029. Therefore, the Secretary is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

## III. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

IT IS SO ORDERED.

ENTER:

*[signature]*

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 8-21-03